

U.S. Department of Justice

*United States Attorney*
*Eastern District of New York*

PP:JDT
F. #2025R00522

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

September 9, 2025

<u>By ECF</u>

The Honorable Seth D. Eichenholtz
United States Magistrate Judge
Eastern District of New York
225 Cadman Plaza
Brooklyn, New York 11201

   Re: <u>United States v. Daniel Baltazar</u>
     <u>Case No. 25-MJ-263</u>

Dear Judge Eichenholtz:

  The government respectfully submits this letter in support of its application for the entry of an order of detention as to the defendant Daniel Baltazar (the "defendant"). The defendant is charged by complaint with the production of child pornography (also commonly known, and referred to herein, as "child sexual abuse material" or "CSAM") in violation of Title 18, United States Code, Section 2251(a). Because this charge carries a presumption of detention, and the defendant is both a danger to the community and a risk of flight, an order of detention should be entered.

 I. <u>Offense Conduct</u>

  The defendant, 29 years old, pretended to be a minor girl and used the internet to request that at least four minor girls (referred to herein as Jane Does 1 through 4) send him sexually explicit images and videos of themselves. The defendant began communicating with Jane Doe 1 on Snapchat in October 2024, at which time Jane Doe 1 was nine years old. The defendant persistently requested nude videos from Jane Doe 1. In one instance, the defendant sent Jane Doe 1 a video of a nude minor girl dancing in a bathroom. Pretending to be the girl in the video, the defendant said to Jane Doe 1, apparently with reference to a video Jane Doe 1 had already sent him, "[Y]ou didn't shake ass like I did in my video." Jane Doe 1 then sent him five videos in which, among other things, Jane Doe 1 exposed and touched her genitals.

  In November 2024, the defendant began communicating via Snapchat with Jane Doe 2, who told him that she was 13 years old and appeared to be between 10 and 13 years old in videos she sent to him. The defendant again pretended to be a minor girl. Between November and December 2024, the defendant and Jane Doe 2 exchanged numerous messages in which the

defendant requested that she send him videos of herself engaged in sexually explicit conduct, including in which she was "pretending like [you] are doing it," an apparent reference to sexual intercourse; "tap[ping] her ass on the floor" while "bouncing" "in the bathroom naked"; and "do[ing] something different" such as "rub[bing] yo[u]r pussy." Jane Doe 2 sent the defendant at least five videos in which Jane Doe 2 exposed her breasts and, at the defendant's direction, bounced up and down in a squatting position in a sexually suggestive manner while wearing a cheerleading uniform. In addition, among other things, the defendant also asked questions about Jane Doe 2's cheerleading experience and whether she had ever seen a boy naked, and suggested that she try to touch her brother's genitals, noting that "[s]iblings do it all the time."

In January 2025, the defendant communicated with Jane Doe 3 via Telegram, again impersonating a minor girl. Jane Doe 3 told the defendant that she was 13 years old and appeared to be between 10 and 13 years old in the video she sent to him. The defendant asked Jane Doe 3 to send him "mini porn vid[s]" and videos in which she was "getting naked . . . in a sexy way." The defendant received from Jane Doe 3 at least one video in which she was fully nude and exposed her genitals.

In December 2024, the defendant communicated via Telegram with Jane Doe 4, who also appeared to be between 10 and 13 years old in images she shared with the defendant. In one exchange, the defendant told Jane Doe 4 to send him an image of her vagina, requesting that she "take [the picture] while you spread it as wide as you can." When Jane Doe 4 then sent him an image of her vagina, the defendant responded by telling her to "spread it with both hands." Jane Doe 4 then sent the defendant another image in which she was touching her vagina with both of her hands. The defendant also requested that she send him videos or images in which she would "make [an implement, such as a pen] go in and out" of her vagina.

In addition to causing young girls to create child sexual abuse material, a search warrant executed on the defendant's cellular telephone showed that the defendant also possessed more than 150 images and videos of CSAM, including, as just one example, a two-minute, 14-second video depicting an adult male vaginally penetrating a prepubescent nude female.

II.     Applicable Law

Under the Bail Reform Act, 18 U.S.C. § 3141 et seq., federal courts are empowered to order a defendant's detention pending trial upon determining that the defendant is either a danger to the community or a risk of flight. 18 U.S.C. § 3142(e). A rebuttable presumption of dangerousness and risk of flight arises where, as here, a defendant is charged with a violation of 18 U.S.C. § 2251 (sexual exploitation of children). 18 U.S.C. § 3142(e)(3)(E). This means that the Court must presume there is "no condition or combination of conditions [that] will reasonably assure the appearance of the person as required and the safety of the community." Id. § 3142(e)(3).

To rebut this statutory presumption, the defendant must come "forward with evidence that he does not pose a danger to the community or a risk of flight." United States v. Mercedes, 254 F.3d 433, 436 (2d Cir. 2001). If the defendant satisfies this burden of production, the government must meet the burden of persuasion by clear and convincing evidence that the defendant presents a danger to the community and/or by a preponderance of evidence that the

defendant presents a risk of flight.  Id.  The concept of "dangerousness" encompasses not only the effect of a defendant's release on the safety of identifiable individuals, such as victims and witnesses, but also "'the danger that the defendant might engage in criminal activity to the detriment of the community.'"  United States v. Millan, 4 F.3d 1038, 1048 (2d Cir. 1993) (quoting legislative history).

Four factors guide the Court's determination of whether the presumptions of dangerousness and flight are rebutted:

(1) "the nature and circumstances of the offense charged, including whether the offense is a crime of violence . . . ";

(2) "the weight of the evidence against the person";

(3) "the history and characteristics of the person, including . . . the person's character" and "past conduct"; and

(4) "the nature and seriousness of the danger to any person or the community that would be posed by the person's release."

18 U.S.C. § 3142(g).  In weighing the evidence presented, "the presumption favoring detention does not disappear entirely, but remains a factor to be considered among those weighed by the district court."[1]  Mercedes, 254 F.3d at 436.

### III.     The Court Should Enter a Permanent Order of Detention

Each of the above factors weighs heavily in favor of a determination that the defendant is both a danger to the community and a risk of flight.

#### a.  The Defendant Poses a Danger to the Community

First, the conduct with which the defendant is charged is extremely serious.  The defendant used the internet to prey upon multiple vulnerable young girls.  Knowing that Jane Does 1 through 4 were minors based on either their messages to him or their appearance, the defendant nevertheless repeatedly solicited them for sexually explicit images and videos under the false pretense of himself being a young girl, thus taking advantage of their youth and inexperience.  He made graphic requests of the victims, including requesting that Jane Doe 4 place a foreign object in her vagina.  In certain instances, including with respect to Jane Doe 4,

---

[1] Evidentiary rules do not apply at detention hearings, and the government is entitled to present evidence by way of proffer, among other means.  See 18 U.S.C. § 3142(f)(2); see also United States v. LaFontaine, 210 F.3d 125, 130-31 (2d Cir. 2000).  In the pre-trial context, few detention hearings involve live testimony or cross-examination; most proceed on proffers.  Id. at 131.  This is because bail hearings are "typically informal affairs, not substitutes for trial or even for discovery."  Id. (internal quotation marks omitted).  Indeed, the Second Circuit has reversed district courts where they have not credited the government's proffer, including proffers with respect to a defendant's dangerousness.  See, e.g., Mercedes, 254 F.3d at 437.

3

his requests resulted in increasingly explicit content from the victims. The defendant even pretended to be a young girl himself in order to trick these victims into creating CSAM. The manner in which he engaged in these exchanges reflects a pattern of exploitative conduct.

Second, the weight of the evidence against the defendant is overwhelming. In addition to statements from at least one of the victims, the government's evidence consists of, among other things, (i) returns from a search warrant served on Snapchat containing electronic communications between the defendant and at least Jane Does 1 and 2 and establishing the defendant's use of the account engaging in these communications; and (ii) an extraction of the defendant's cell phone, seized as a result of a judicially-authorized warrant and containing electronic communications between the defendant and Jane Does 3 and 4, including the child sex abuse material made at his direction. In addition, even outside of him causing young girls to create CSAM, the defendant's phone contained more than 150 videos and images of CSAM.

Third, the defendant works as an EMT, a position of trust and authority in which he may have access to young people in compromised situations. He recently also worked at a summer camp for homeless youth and previously worked at another summer camp/afterschool program for youths, both of which show that he is a danger to vulnerable minors. The Court must consider the defendant's dangerousness not only to Jane Does 1 through 4, but to the community, including other potential victims. The defendant's repeated exploitation of minor girls, including by deception, emphasizes the nature and seriousness of the danger to any member of the community, including other minor children. For these reasons, the history and characteristics of the defendant, when combined with the overwhelming evidence of him pretending to be a young girl to cause vulnerable children to create child sex abuse material for his pleasure, show that he poses a danger to the community, and weigh in favor of detention.

      b. The Defendant Poses a Risk of Flight

In addition to the clear danger posed if the defendant were to be released, the defendant poses a significant risk of flight. For his charged conduct, the defendant is facing a mandatory minimum sentence of 15 years, which provides a substantial incentive to flee. See 18 § U.S.C. 2251(e). When the incentive to flee is so strong, no combinations of sureties and other restrictions can assure his appearance. See, e.g., United States v. English, 629 F.3d 311, 321-22 (2d Cir. 2011) (affirming detention in part because the defendant was charged under § 924(c), faced a presumption against release, and a mandatory minimum sentence that incentivized fleeing); United States v. Henderson, 57 F. App'x 470, 471 (2d Cir. 2003) (summary order) ("[T]he presumption regarding flight risk has changed because Becton now faces a ten-year mandatory minimum sentence."). Because of the strength of the evidence and the lengthy prison sentence he faces upon conviction, the defendant is a risk of flight and should be detained.

IV.	Conclusion

For the foregoing reasons, the government respectfully requests that the Court enter a permanent order of detention.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By:	/s/ Joshua D. Tannen
Joshua D. Tannen
Assistant U.S. Attorney
(718) 254-6422

cc:	Clerk of the Court (SDE) (by email)
Counsel of record (by email)